Good morning, Your Honor. Lawrence Rolfing on behalf of the Appellant Mary Salmon. This is a Social Security disability case. It comes down to a very simple question of whether the ALJ erred in finding that Ms. Salmon could perform a full range of sedentary work, including a variety of her past work, which was skilled in nature. And the substantial evidence rule is founded upon a notion that we review the record as a whole. And the treating physician rule is articulated in the regulations at 404.1527d2. And as the Commissioner construes it in his own ruling, stand for the proposition, which is echoed in Orn v. Astrue, that once the ALJ accepts the proposition that's articulated by the basis for his opinion, that it's not inconsistent, which is a term of art, with other medical evidence in the record, that the ALJ can't swallow the camel and spit out the gnat. The ALJ here accepted the proposition that Ms. Salmon has an L1 burst fracture, that she either has radiculitis or radiculopathy. Both of them have neurological components. The treating physician, Dr. Greenwald, said she can't sit for six hours a day. This is consistent with a psychological evaluation by Dr. Weiss, which said she couldn't tolerate sitting through a medical evaluation, much less six hours a day. And once we get to that proposition, the record as a whole and the treating physician rule in combination disgorge the ALJ of the discretion to simply reject Dr. Greenwald's opinion for any of the reasons articulated in this record. Now, let me ask you if you've really argued three things, one about the mental impairment, the physical, Dr. Collision, and then the credibility issue. Yes. If we were to credit your argument on the mental impairment, but determine there was substantial evidence with respect to the findings on the physical impairment, where would that leave Ms. Salmon? Well, if you credit the argument on the mental impairment, then Ms. Salmon can't perform her past relevant skilled work and wouldn't be able to perform any other skilled work. And she, at her advanced age, she would figure it out. It would then, in effect, override the medical. Yes. They are, in your view, are those, in effect, independent grounds for a finding of disability? Yes. All right. Ms. Salmon wins on any ground that knocks out her past relevant work. If we accept, once we accept the proposition that she's limited to sedentary work, her burden of proof is to prove that she cannot perform any others, any of her past relevant work. And there's just no basis in this record to assume that an individual with the kind of pain and or depression that Ms. Salmon suffers from, that she could perform skilled work. And I know that there's one recent case from this Court, Hupai v. Astru, that where the attorney for Hupai tried to make the distinction between mental and physical pain. And I think that it's just a poor litigation posture. In this case, it's clear that Ms. Salmon suffers from pain and or depression. And her argument has consistently been that she can't perform the mental requirements of work. And although the Act requires a medically determinable impairment, it doesn't require us to draw the etiology line with clear, bright markers. She has an impairment. It affects her ability to perform the mental requirements of work. And she can't reasonably perform skilled work on this record. She's in too much pain and or depression. Ginsburg. In your view, she doesn't, you don't need to parse the, I think they had a, she was either without evidence of radical, I can never say that, or she suffers with it. You know, they do have this sort of fine line that's made in there. Right. In your view, one wouldn't need to draw that fine line in order to sustain the mental impairment issue. That's correct. So that would be crediting Dr. How do you pronounce that? Will you say that word for me again? Say it again. Pediculopathy. Pediculopathy. Thank you. I read it, I see it, I hear it, and then I mispronounce it. So thank you. Some of those medical terms just get shorthand like spondylolisthesis. People just say spondy just because it's easier. But if the court doesn't have any additional questions, that really is the sum and substance of my question. I do have one factual question. Part of the CE report, I don't know whether you happen to have that with you, I think it's page 165, the diagnostic impressions section, I just didn't know literally what that meant. I'm kind of in Judge McCune's boat there about some things I can't pronounce. Yes. She has the status post C57 anterior spinal fusion with instrumentation changes. I'm sorry, I'm on page 165. The diagnostic impressions are about halfway down the page. Axis 1, axis 2, axis 3. Yes. Do you know what those things refer to? They're obviously some tests, but I don't know what they are. Well, the diagnostic impressions on this psychological consultative examination indicate axis 1 are mental impairments that arise during the process of life. And Dr. Weiss writes that there's no diagnosis, which means that she couldn't find a medically determinable mental impairment. Axis 2 refers to lifelong conditions, personality disorders, mental retardation, borderline intellectual functioning, things of that nature that are lifelong, that are not amenable to treatment. And then axis 3 refers to physical impairments, which is deferred to medical opinion. So really this is the central part of the CE's findings then. Axis 1 and axis 2 are the basis of the ALJ's report. Is that fair to say? Yes, it is. Okay. Yes, it is. And are those axis 1, axis 2 diagnostic impressions, are they some sort of recognized set of battery tests? Is that based on what the test discussed earlier, or what is it exactly? An axis 1 or axis 2 diagnosis is the conclusion that the doctor draws from the medical data. Okay. So when the doctor says there's no axis 1 diagnosis, the doctor is saying, based upon my clinical evaluation, based upon these test results, this person does not have a depressive disorder, this person does not have an anxiety disorder, this person does not have a psychotic disorder. So that, in Dr. Weiss's opinion, this test data doesn't justify a diagnostic impression of a discernible mental impairment, medically determinable impairment. So how do you deal with that? Well, we have to draw the line between the data and the conclusions. And we don't do it by taking one domino out at a time and examining it. We look at the evidence and the record as a whole. And Dr. Weiss is very clear in her report that Mary Salmon was tearful throughout the evaluation. She was also in distress due to reported pain in her back. She was uncomfortable and needed to shift in her chair several times. And later on she says that she was unable to endure the stress of the interview and testing due to the process of what appeared to be physical pain. Let's put aside the physical pain for the moment and focus on the mental impairment. If you have a finding by the CE, apparently we do, that there is no mental impairment, how do you get around that? Well, sometimes we grab onto a rope and we think it's a rope and somebody else grabs onto a tree trunk and they think it's a tree trunk and they're just grabbing onto different parts of the elephant. And that's what we have here. Dr. Weiss is describing the tail and Dr. Silverman is describing the trunk. So it's a credibility issue. It's a – it's the entirety of the record problem. We don't – the universal camera, the Supreme Court's decision, universal camera, doesn't allow us, and this Court's decision in Reddick v. Chader and other cases, don't allow us to take pieces of the record out and hold it up and say, oh, well, this justifies a conclusion, because it all fits together as a synergistic puzzle. And we have Dr. Weiss conceding that this woman is in incredible pain and couldn't sit through the easy part of life, sitting through a medical evaluation, completing some pen and paper psychological tests, answering some questions, that that was too much for her to endure. On this doctor's review of this person in person, and ALJ – the ALJ says, well, she can sit through and be an office manager and manage people, not for an hour, but for eight hours a day, five days a week, 4.3 weeks a month. And it is absolutely necessary that we draw this logical line through the record and see what the record informs the ALJ and whether that conclusion has the support of substantial evidence, not an iota of evidence, but the record-based and an entire reading. You may want to reserve your small amount of time. Yes, I will. I'll reserve five seconds. Thank you. Good morning. May it please the Court, my name is Odell Grooms, and I represent the appellee, the Commissioner of Social Security. Your Honors, this appellant is essentially contending that she is unable to perform substantial gainful activity due to a mental impairment. And the genesis of that mental impairment, according to the medical evidence, or according to the appellant's argument, is the pain that she suffers. The ALJ, while noting that there was indeed objective medical evidence to show that this individual has an impairment that would likely produce some subjective pain, found and listed clear and convincing reasons based on substantial evidence as to why the alleged degree of pain that this appellant asserts is not credible. And I would like to go through the discussion of the pain evidence. First of all, the pain results from an accident that this appellant suffered in May of 2003. And because of that accident, she suffered an injury to the C5-C7 area of her neck. In June of 2003, her treating physician, Dr. Greenwald, successfully treated that C5-C7 injury and noted that the appellant tolerated that procedure well. Three successive visits to that doctor, this appellant stated that she was doing fine. On June 20th of 2003, excuse me, on July 3rd of 2003, the appellant stated she was doing extremely well, absolutely no numbness or tingling, no pain or weakness whatsoever. She only complained of some low back pain. There was no mention of any radiculopathy or any radiation of pain. On the 21st of August, fully two months after the successful surgery, this appellant again stated that she felt great, that there was nothing wrong with her neck and arm, no complaints at all, no numbness or tingling, there was lower back pain, again, without radiation. And on September 11th of 2003, she again stated that her upper body, the neck area, et cetera, was doing fine, and the only thing she complained of, again, was lower back pain, without any radiation. The doctor did note that there was some marked pain in the middle back. Based upon that, the treating physician concluded that the impairment regarding the C5-C7, or that the allegation of impairment regarding the C5-C7 area was unfounded. Next, regarding the lower back pain. Again, she did mention several times that she had lower back pain, but again, there was no mention of any radiculopathy or any radiation. And the doctor therefore found that, or excuse me, the ALJ therefore appropriately found that although she did have the severe impairment of low back pain, it did not amount to an impairment that would preclude her from doing sedentary work. Counsel, could I interrupt you? There's no finding here of any malingering. Is that accurate? There is no finding of malingering, Your Honor, but there are several. Well, that was the answer to my question. So next, she does have objective medical problems with her back, and she's complaining of severe pain. Now, as I read the cases, we have to credit that. The ALJ had to credit that. The severity of the pain becomes accepted if in fact there are objective medical impairments, and nobody denies that she has some problems with her back. Is that correct? Nobody denies that this appellant has problems with her back, Your Honor, and nobody denies that this appellant suffers pain. The ALJ found, the administrative law judge found, however, that the degree of pain that this appellant alleges, based on the entirety of the record, is not founded or is not credible. Is he allowed to do that? Yes, Your Honor, he is. Under Magallanes, he is allowed to do that, and under Thomas, he is allowed to do that, and under Fair, he's allowed to do that. But I think he has to give some very concrete reasons for not crediting her complaints of pain. Your Honor, first of all, she, and the ALJ absolutely did do that. First of all, she's alleging that she had severe pain in her neck. Well, as I just detailed, and as the ALJ pointed out, she went through successful surgery, and she herself stated for months after the surgery that everything was fine, that, you know, the problems that she was having as a result of the automobile accident had been resolved. And, in fact, her treating physician stated in his RFC later on, and in contradiction to her assertion of an impairment, the ALJ, I mean, the treating physician stated that the radiculopathy in her C5-C7 area was resolved. The doctor stated that on 6-20 or 6-21, in December of, or November of 2004, that that had been resolved. Now, the... I'm just going back to a factual point on the presence of radiculopathy. I thought that Dr. Greenwald said that she suffers from radiculopathy. Is that correct? In the lower back area down to her, and radiates to her legs. But in the C5-C7 area... So she does have, according to him, a physical characteristic that presents itself, which is radiculopathy. Then you have Dr. Salamanca who says without evidence of that. So it seems to me that that's not a conclusion drawn from a physical impairment. But those are two different views of whether she actually has this physical condition. Is that correct? I would answer it this way, Your Honor. The ALJ relied on the opinion of Dr. Salamanca in arriving at his residual functional capacity. Correct. And Dr. Salamanca conducted her own independent examination of this repellent. And she details those findings in great detail. So maybe to be more precise in my question, what's the basis for accepting the finding of without evidence of radiculopathy as opposed to Dr. Greenwald's conclusion, at least with respect to the lower back? Dr. Greenwald performed no examination at the time that he arrived at that residual functional capacity in November of 2004. I would submit, Your Honor, that it is entirely based or greatly based on this repellent's own assertions and not on any examination performed by Dr. Greenwald. And, in fact, there are several inconsistencies with his own treatment notes. In the December RFC, he found that she had this lower back pain with radiculopathy and that this repellent had stated that she always had that radiating pain. Well, she did not. As I mentioned earlier on, on several occasions, she stated to the doctor, I don't have radiating pain. But yet he found later on that she did. That's inconsistent with her own statement. And the doctor based his RFC on, he stated himself that I primarily based my residual functional capacity on the lower back pain radiation that this plaintiff stated, this repellent stated that she has. So I would say that that is inconsistent with the medical evidence. Essentially, further, it's undercut by his own statement that he was unable to complete his RFC. He was unable to complete her prognosis because she had not gotten an MRI done as he had instructed her to do. So the medical evidence does not support Dr. Greenwald's RFC or his assessment that this repellent can do less than sedentary work. Did the examining physician do an MRI? No, Your Honor, the examining physician did not do an MRI, but the examining physician did conduct a very extensive physical examination in the office to include assessing this repellent's strength in the upper and lower extremities, her range of motion, her flexion, her ability to stretch, her ability to bend, et cetera. And based thereon found that she did retain the ability to perform sedentary exertion. Thank you. Thank you for your argument. You have a minute for rebuttal, Mr. Wolfman. Thank you very much, Your Honor. The ALJ's statement on the credibility analysis is found on page 19 of the administrative record. The ALJ states that he found Ms. Salmon's testimony not credible, that she had excellent results on the cervical fusion, that she had not seen the doctor since September of 2003, that he doesn't mention the back problem. Two paragraphs down he says there are no treatment records, only mild objective findings. Dr. Salamanca found an L1 burst fracture and radiculitis. That is not a mild finding. With respect to the government's assertion that Dr. Greenwald did not examine Ms. Salmon in December of 2004, that's flatly reflected in page 226 of the administrative record. On exam she has marked tenderness. She is neurologically intact. The impression is chronic low back pain with bilateral lumbar radiculopathy. In the second paragraph of that report he says that her cervical radiculopathy had resolved, which is consistent with what she had been talking about. She had neck surgery. Is the radiating pain gone? Yes, it is. We're talking about the neck. But she has another problem. All right. Thank you. Thank you. We have both of your arguments well in mind. Counsel, thank you for your argument. The case of Salmon v. Estrue is submitted.
judges: Fletcher, McKeown, Gorsuch